UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:19-CV-00030-GNS-HBB

WATER MANAGEMENT SERVICES, LLC                                    PLAINTIFF

v.

CITY OF EDMONTON                                                        DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Summary Judgment (DN 19).  The

motion is ripe for adjudication.  For the reasons that follow, Plaintiff's motion is **GRANTED**.

### I.       BACKGROUND

Plaintiff Water Management Services, LLC ("WMS") asserts this breach of contract action

against Defendant City of Edmonton ("Edmonton").  (Compl. 6, DN 1).  WMS has moved for

summary judgment which, of course, is opposed by Edmonton.  (Pl.'s Mot. Summ. J., DN 19;

Def.'s Resp. Pl.'s Mot. Summ. J., DN 22).

WMS provides planning, engineering, design, construction oversight, project management,

and operation services for water, wastewater, and related projects.  (Compl. ¶ 6).  The relationship

between WMS and Edmonton began after Edmonton received violation notices from the Kentucky

Division of Water ("KDW") for excessive levels of disinfectant byproducts in its water supply.

(Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 5, at 2-6, DN 22-5).  On July 25, 2018, Edmonton entered

into a contract with WMS (the "Agreement") to assist in carrying out a corrective action plan to

address the violations.[1]  (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 22, DN 22-7; Garrett Dep.

12:9-20, 14:9-11, Nov. 13, 2019, DN 19-5).

---

[1] The Agreement consists of 18 pages, plus several exhibits which are incorporated by reference.

On February 14, 2019, Edmonton terminated the Agreement without cause pursuant to Paragraph 6.06.B.2, which states "[t]he obligation to provide further services under this Agreement may be terminated . . . [f]or convenience, by Owner effective upon Engineer's receipt of notice from Owner." (Pl.'s Mot. Summ. J. Ex. M, at 2, DN 19-14; Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 12-13). Paragraph 6.06.D provides:

1. In the event of any termination under Paragraph 6.06, Engineer will be entitled to Invoice Owner and to receive full payment for all services performed or furnished in accordance with this Agreement and all Reimbursable Expenses incurred through the effective date of termination. . . .

2. In the event of termination by Owner for convenience or by Engineer for cause, Engineer shall be entitled, in addition to invoicing for those items identified in Paragraph 6.06.D.1, to invoice Owner and receive payment of a reasonable amount for services and expenses directly attributable to termination, both before and after the effective date of termination, such as reassignment of personnel, costs of terminating contracts with Engineer's Consultants, and other related close-out costs, using methods and rates for Additional Services as set forth in Exhibit C.

(Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 13). WMS asserts that it is entitled to receive $150,035 plus interest for its "services performed or furnished in accordance with th[e] Agreement . . . ." (Pl.'s Mem. Supp. Mot. Summ. J. 11, DN 19-1 (internal quotation marks omitted) (citation omitted)).

## II.     JURISDICTION

Diversity jurisdiction exists here, as WMS's principal place of business is in Tennessee and its members are all citizens of Tennessee, while Edmonton is a citizen of Kentucky. *See* 28 U.S.C. § 1332(a)(1); *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009) ("The general rule is that all unincorporated entities—of which a limited liability company is one—have the citizenship of each partner or member." (citing *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187-92 (1990))); (Compl. ¶¶ 2-3, DN 1; Answer ¶ 3, DN 6).

2

### III.   STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of stating the basis for the motion and identifying the evidence demonstrating an absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party satisfies its burden, the nonmoving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable for the nonmoving party, the nonmoving party must do more than merely show the existence of some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  Rather, the nonmoving party must present facts proving that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ."  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to overcome summary judgment.  *Anderson*, 477 U.S. at 252.

### IV.   DISCUSSION

Kentucky state substantive law governs WMS's breach of contract claim.  *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) ("[F]ederal courts sitting in diversity 'apply state substantive law and federal procedural law.'"  (Stevens, J., concurring) (citation omitted)); *see also Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006)

("As we are sitting in diversity, we apply the substantive law of Kentucky, the forum state." (citation omitted)).

The issue in this case is whether WMS has established a breach of contract by Edmonton for purposes of summary judgment which would entitle WMS to the $150,035 plus interest that it claims.  The operative provision in the Agreement is Paragraph 6.06.D.1, which states:  "In the event of any termination[,] . . . Engineer will be entitled to invoice Owner and to receive full payment for all services performed or furnished in accordance with this Agreement . . . through the effective date of termination."  (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 13).  The key point of contention is the meaning of the phrase "in accordance with this Agreement."

Paragraph 2.01.B of the Agreement provides that Edmonton "shall pay Engineer as set forth in Article 4 and Exhibit C."  (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 5).  Paragraphs 4.01 and 4.02 provide:

4.01   *Invoices*

    A.    *Preparation and Submittal of Invoices*:  Engineer shall prepare invoices in accordance with its standard invoicing practices and the terms of Exhibit C.  Engineer shall submit its invoices to Owner on a monthly basis.  Invoices are due and payable within 30 days of receipt.

4.02   *Payments*

. . .

    B.    *Failure to Pay*:  If Owner fails to make any payment due Engineer for services and expenses within 30 days after receipt of Engineer's invoice, then:

        1.    amounts due Engineer will be increased at the rate of 1.0% per month (or the maximum rate of interest permitted by law, if less) from said thirtieth day[.]

. . .

C.    *Disputed Invoices*:  If Owner disputes an invoice, either as to amount or entitlement, then Owner shall promptly advise Engineer in writing of the specific basis for doing so, may withhold only that portion so disputed, and must pay the undisputed portion subject to the terms of Paragraph 4.01.

(Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 6-7).  Article 2 of Exhibit C provides, in part:

A.    Owner shall pay Engineer for Basic Services set forth in Exhibit A . . . as follows:

1.    A Lump Sum amount of $395,400.00 based on the following estimated distribution of compensation:

| | | |
|---|---|---|
| a. | Funding Application and Report Phase[2] | $19,700.00 |
| b. | Preliminary Design Phase | $60,000.00 |
| c. | Final Design Phase | $197,000.00 |
| d. | Bidding and Negotiating Phase | $20,000.00 |
| e. | Construction Phase | $79,000.00 |
| f. | Post-Construction Phase | $19,700.00 |

2.    Engineer may alter the distribution of compensation between individual phases noted herein to be consistent with services actually rendered, but shall not exceed the total Lump Sum amount unless approved in writing by the Owner.

. . .

5.    The portion of the Lump Sum amount billed for Engineer's services will be based upon Owner's estimate of the percentage of the total services actually completed during the billing period.

(Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 42).

---

[2] This phase is interchangeably referred to as the "Funding Application and Report Phase", the "Funding and Reporting Phase", and the "Study and Report Phase" throughout the parties' relationship.  (Def.'s Resp. Pl.'s Mot. Summ. J. 5 n.28).

WMS submitted three invoices for work on the project in 2018, which Edmonton paid. (Pl.'s Mem. Supp. Mot. Summ. J. 6; Def.'s Resp. Pl.'s Mot. Summ. J. 8-9; Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 9, at 2-4, DN 22-9).   The first invoice dated August 27, 2018, indicated that WMS had completed 20% of the Funding Application and Reporting Phase and 10% of the Preliminary Design Phase, for which it billed Edmonton $3,940 and $25,700 respectively.   (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 9, at 2).   The second invoice dated November 16, 2018, reflected that WMS had completed 40% more of the Preliminary Design (for a total of 50% completion of that phase), for which it billed Edmonton $4,300.   (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 9, at 3).   The third invoice on December 13, 2018, billed Edmonton $9,000 for an additional 15% of the Preliminary Design (for a total of 65% completion of that phase).   (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 9, at 4).   WMS also performed work on the Design Phase for which it did not bill as a courtesy.   (Pl.'s Mem. Supp. Mot. Summ. J. 6-7; Boyers Dep. 16:6-17:19, 31:13-19, Feb. 26, 2020, DN 22-8).

Termination of the Agreement apparently was set into motion when the mayor who signed the Agreement on behalf of Edmonton, Howard Garrett ("Garrett"), lost reelection and the new mayor, Doug Smith ("Smith"), took office on January 1, 2019.   (Garrett Dep. 7:1-9, Nov. 13, 2019, DN 19-5; Smith Dep. 10:12-17, Jan. 30, 2020, DN 19-6).   A meeting between WMS and Edmonton was scheduled for January 10, but Smith cancelled it and did not reschedule.   (Smith Dep. 34:7-36:6).   On January 25, 2019, WMS sent Edmonton an invoice for $15,985, which included $985 for 5% of the Funding Application and Reporting budget (for a total of 25% completion of the Funding Application and Reporting Phase), plus $15,000 for 25% of the Preliminary Design Phase (for a total of 90% completion of the Preliminary Design Phase budget).   (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 13, at 2, DN 22-13).   WMS continued to hold off on billing Edmonton for work done

6

on the Design Phase as an accommodation.  (Pl.'s Mem. Supp. Mot. Summ. J. 8; Boyers Dep. 16:6-17:19, 31:13-19).

On February 4, 2019, Smith participated in a closed session with the city council, which authorized Smith to renegotiate the Agreement.  (Smith Dep. 36:14-37:25, 40:2-7).  On February 6, 2019, WMS's representative met with Smith to discuss issues relating to the project.  (Bailey Dep. 29:8-32:1, Feb. 26, 2020, DN 19-2).  Smith requested that WMS's representative provide Edmonton with a complete billing statement covering all of WMS's services to that date.  (Bailey Dep. 32:22-33:11; Smith Dep. 49:5-16).  On February 8, 2019, Edmonton received another invoice from WMS for $134,050, $6,000 for completion of the Preliminary Design and $128,050 for 65% completion of the Final Design.  (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 14, at 2).  Edmonton then terminated the Agreement on February 14.  (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 14, at 2, DN 22-14).

Edmonton's primary objection is that WMS did not comply with two pertinent provisions of the Agreement.  Paragraph A1.01.B of Exhibit A states:  "Engineer's services under the [Funding Application] and Report Phase will be considered complete on the date when Engineer has delivered to Owner the revised Report and any other [Funding Application] and Report Phase deliverables."  (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 25).  Paragraph A1.02.A of Exhibit A provides that WMS must begin work on the Preliminary Design Phase "[a]fter acceptance by Owner of the Report and any other [Funding Application] and Report Phase deliverables" and "upon written authorization from Owner."  (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 25).  Edmonton argues that because WMS never completed the Funding Application and Report Phase by delivering the required items to Edmonton and because Edmonton never provided written authorization to WMS to proceed with the Preliminary Design Phase, WMS's $15,000 of work on

7

the Preliminary Design Phase was unauthorized.  (Def.'s Resp. Pl.'s Mot. Summ. J. 16-18).  In response, WMS asserts that Edmonton waived its right to insist that WMS comply with these formalities because Edmonton paid WMS three invoices for Plaintiff's work on the Preliminary Design Phase without insisting on compliance with the referenced preconditions.  (Pl.'s Reply Mot. Summ. J. 3-8, DN 23).

"Waiver is defined as an intentional relinquishment of a known right.  It may be express or it may be inferred from the acts or conduct of a party." *Bates v. Grain Dealers Nat'l Mut. Fire Ins. Co.*, 283 S.W.2d 3, 5 (Ky. 1955).  "A party may waive or relinquish rights to which he is entitled under a contract, and having done so may not reverse his position to the prejudice of another party to the contract." *Stamper v. Ford's Adm'x*, 260 S.W.2d 942, 943 (Ky. 1953) (citations omitted).  "Whether a party's actions constitute a waiver is a question of law." *Lyles v. RDP Co.*, 702 F. App'x 385, 398 (6th Cir. 2017) (citing *Eaton v. Trautwein*, 155 S.W.2d 474, 478 (Ky. 1941)).  "[P]rovisions in contracts requiring any changes to be in writing can be altered by the parties' course of dealing or waiver." *City of Sci. Hill v. Mayes, Sudderth & Etheredge, Inc.*, No. 2003-CA-001903-MR, 2005 WL 1313681, at *6 (Ky. App. 2005) (citations omitted); *see also Willey v. Terry & Wright of Ky., Inc.*, 421 S.W.2d 362, 363 (Ky. 1967) ("[T]he parties by their course of dealing abrogated the written approval clause.  It makes no difference what name we apply to the theory on which we reach this conclusion, whether it be contemporaneous construction, waiver, estoppel, novation, or what have you.  The theory simply is that by their course of dealing the parties showed that they did not intend the written approval clause to be strictly observed."); *Wehr Constructors, Inc. v. Steel Fabricators, Inc.*, 769 S.W.2d 51, 53-54 (Ky. App. 1988) ("[A] provision may be excused where there has been a modification, waiver, or abrogation thereof, written or oral, or where the general contractor is estopped to rely upon it.  The

8

parties, by their course of dealing, may also abrogate such clause requiring written approval." (citations omitted)).

Having thrice paid WMS for work done on the Preliminary Design Phase without holding WMS to the contractual conditions requiring completion of the Funding Application and Reporting Phase and written authorization to begin the preliminary design, Edmonton waived its right to insist on compliance with those conditions when it was subsequently billed $15,000 for work done on the Preliminary Design Phase. *See In re Thirteenth Floor Ent. Ctr., LLC*, 507 F. App'x 473, 476-77 (6th Cir. 2012) (applying Kentucky law to find waiver of breach of contract claim when defendant with knowledge of the alleged breach continued performing and did not claim breach until sued). Additionally, there is no indication that Edmonton is disputing WMS's entitlement to an additional $985, which is the portion of the January 25, 2019, invoice corresponding to work done on the Funding Application and Report Phase. For these reasons, WMS has established Edmonton's liability as to the $15,985 it claims for that work.

Regarding the February 8, 2019, invoices totaling $134,050, Edmonton argues that the same conditions that originally applied to the Preliminary Design Phase also apply to the Final Design Phase. Similar to the conditions for the Preliminary Design Phase, Paragraph A1.03 of Exhibit A provides that WMS shall commence work on the Final Design Phase:

> **After** acceptance by Owner of the Preliminary Design Phase documents, revised opinion of probable Construction Cost as determined in the Preliminary Design Phase, and any other Preliminary Design Phase deliverables, subject to any Owner-directed modifications or changes in the scope, extent, character, or design requirements of or for the Project, and upon written authorization from Owner.

(Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 26 (emphasis added)). Edmonton also points out that WMS has admitted that it did not submit the documents called for under Paragraph A1.03 prior to

9

the commencement of work on the Final Design Phase.  (Def.'s Resp. Pl.'s Mot. Summ. J. 15; Boyers Dep. 25:9-22).

WMS responds that Edmonton similarly waived those conditions, not only by paying WMS for work done on the Preliminary Design Phase without insisting on compliance with the formalities of Paragraphs A1.01B and A1.02, but also through former mayor Garrett's express permission to proceed with the Final Design Phase:

> Q      [D]id the City of Edmonton ever accept the preliminary design phase documents or approve those documents?
> A      Yes.  They told us in our meetings that they were fine with the alignment and—and the preliminary and to move on with the design.
> . . .
> Q      Did the City of Edmonton ever give you written authorization to move onto the final design phase?
> A      They did not provide written.  We were told verbally.
> Q      Okay.  And who told you that?
> A      The [former] mayor . . .

(Boyers Dep. 26:25-27:16).  Of crucial importance, Edmonton does not dispute that its agent, Garrett, told WMS to proceed with work on the Final Design Phase.  By expressly waiving compliance with the submission requirement and directing WMS to proceed with the final design work, Edmonton waived the conditions precedent to beginning work on the final design.[3]  *See Thirteenth Floor*, 507 F. App'x at 476-77.

Edmonton also takes issue with WMS's "backbilling[,]" i.e., waiting until February 8, 2019, to bill Edmonton for work on the Final Design Phase that WMS states it had done as early as December 13, 2018.  Edmonton points to Paragraph 4.01A of the Agreement and Paragraph C2.01.A.5 of Exhibit C in support of its argument that the Agreement does not provide for

---

[3] Edmonton also asserts that it never would have allowed WMS to proceed with work on the Final Design Phase without the proper funding, which the city never received.  (Def.'s Resp. Pl.'s Mot. Summ. J. 15-16).  Edmonton, however, fails to point to any specific contractual provision conditioning payment to WMS on the receipt of funding for the project.

backbilling.  (Def.'s Resp. Pl.'s Mot. Summ. J. 18-19).  Paragraph 4.01.A states that "Engineer shall prepare invoices in accordance with its standard invoicing practices and the terms of Exhibit C.  Engineer shall submit its invoices to Owner on a monthly basis."  (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 6).  Paragraph C2.01A.5 of Exhibit C provides that "[t]he potion for the Lump Sum amount billed for Engineer's services will be based upon Engineer's estimate of the percentage of the total services actually completed during the billing period."  (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 42).  Edmonton argues that these two provisions required WMS to bill Edmonton for the services it completed and not withhold billing for services it had already rendered.

WMS answers by also pointing to Paragraph 4.01.A, highlighting the portion that allows it to "prepare invoices in accordance with its standard invoicing practices."  (Pl.'s Reply Mot. Summ. J. 9; Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 6).  WMS representatives testified that its "standard invoicing practice[]" of backbilling on former projects with Edmonton and the project at issue here was known by Edmonton through former mayor, Garrett.  (Boyers Dep. 16:22-17:19; Bailey Dep. 24:18-25:13); *see Day v. Exch. Bank of Ky.*, 78 S.W. 132, 133 (Ky. 1904) ("The general rule is that notice to an agent is notice to his principal."  (internal quotation marks omitted) (citation omitted)).  Although WMS did not relate its practice of backbilling specifically to the Final Design Phase, its representatives did testify that this was a typical practice with its billing generally. (Boyers Dep. 16:22-17:19; Bailey Dep. 24:18-25:13).

There appears to be some discrepancy between how WMS was supposed to bill Edmonton: On one hand, backbilling was part of WMS's "standard invoicing practices"; on the other hand, the Agreement also provides that "[t]he portion of the Lump Sum amount billed for Engineer's services will be based upon Engineer's estimate of the percentage of the total services actually

11

completed during the billing period." (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 6, 42). Regardless, Edmonton has failed to explain why WMS's purported failure to bill properly excuses Edmonton from paying for WMS's work; Edmonton has not articulated why the failure to bill timely allows it to altogether withhold payment for work that undisputedly has been done. *See Fay E. Sams Money Purchase Pension Plan v. Jansen*, 3 S.W.3d 753, 757 (Ky. App. 1999) ("It is elementary that a contract may not be rescinded unless the non-performance, misrepresentation, or breach is substantial or material."); *see also Marshall v. Wise*, No. 2005-CA-001404-MR, 2006 WL 3378477, at *2 (Ky. App. Nov. 22, 2006) ("The issue before us, then, is whether Wise's delay in preparing a written agreed order was a *material* breach of the contract so as to excuse performance by Marshall." (emphasis added)).

In that vein, Edmonton's only specific challenge to the substance of WMS's work is that "[WMS] presented [Edmonton] with incomplete preliminary design plans and half-finished materials that included blatant errors such as incorrect water line sizes." (Def.'s Resp. Pl.'s Mot. Summ. J. 19). WMS responds by pointing out it has never represented that the Final Design Phase was finished, but rather expressly claimed that it was only partially completed. (Pl.'s Reply Mot. Summ. J. 11). WMS's point is well-taken. It makes no sense for Edmonton to terminate the Agreement early and then complain that WMS's work product was incomplete. Edmonton has not shown any valid excuse for not paying WMS for the work it performed under the Agreement, other than WMS's failure to complete portions of the project which were incomplete when Edmonton cancelled the contract. A party to a contract cannot prevent performance by the other and then use that non-performance as the basis for claiming breach. *See 20th Century Coal Co. v. Taylor*, 275 S.W2d 72, 75 (Ky. 1954) ("One party may not successfully accuse the other of failure

to perform when the former does not permit the performance." (citations omitted). Summary judgment will therefore be granted in WMS's favor.

WMS has proven that it is entitled to $150,035, consisting of the January 25, 2019, invoice for $15,895 and the February 8, 2019, invoice for $134,050, plus interest. (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. 7, at 7 ("If Owner fails to make any payment due Engineer for services and expenses within 30 days after receipt of Engineer's invoice, then . . . amounts due Engineer will be increased at the rate of 1.0% per month (or the maximum rate of interest permitted by law, if less) from said thirtieth day . . . .")). There are no material issues of fact, and WMS has demonstrated that it is entitled to summary judgment as a matter of law.

## V.   CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Plaintiff Motion for Summary Judgment (DN 19) is **GRANTED**. Plaintiff Water Management Services, LLC is entitled to $150,035 plus pre-judgment interest pursuant to Paragraph 4.02.B.1 of the Agreement and post-judgment interest pursuant to 28 U.S.C. § 1961. The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

August 31, 2020

cc:    counsel of record

13

August 31, 2020